1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KAY NEE,                                          )   CASE NO. CV 08-06245 MMM (AJWx)
                                                  )
                    Plaintiff,                    )
                                                  )
            vs.                                   )   FINDINGS OF FACT AND
                                                  )   CONCLUSIONS OF LAW
FEDERAL DEPOSIT INSURANCE                         )
CORPORATION, in its own name and as               )
Receiver for IndyMac Bank, F.S.B.,                )
Pasadena, CA; DOES 1 through 10,                  )
                                                  )
                    Defendants.                   )

On July 11, 2008, the Office of Thrift Supervision ("OTS") closed IndyMac Bank, F.S.B. ("IndyMac") and appointed the Federal Deposit Insurance Corporation ("FDIC") as the bank's receiver pursuant to 12 U.S.C. § 1821(c)(2)(A).  That same day, the FDIC formed IndyMac Federal Bank, a newly chartered depository institution, and transferred IndyMac's insured deposits to it.  The FDIC made deposit insurance determinations for accounts held at IndyMac and notified depositors of the determinations via letter.  Some depositors, including plaintiff, later filed actions challenging the FDIC's deposit insurance determinations and/or alleging wrongful acts by IndyMac or its former employees prior to commencement of the receivership.

Plaintiff filed an opening brief on January 25, 2010.[1]  Defendant filed an opening brief on

_____

[1]Plaintiff's Opening Trial Brief ("Pl.'s Brief"), Docket No. 48 (Jan. 25, 2010).

February 1, 2010.[2]  Plaintiff filed a responsive brief on February 22, 2010,[3] while defendant filed its responsive brief on March 1, 2010.[4]  Following the passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") on July 21, 2010, the parties submitted supplemental briefing regarding the FDIC's revised deposit insurance determinations for plaintiff's accounts.[5]

# I.  FINDINGS OF FACT

### A.    The Accounts

1.      Plaintiff Kay Nee had seven accounts with IndyMac prior to July 11, 2008.[6]

2.      Prior to July 11, 2008, account XXXXXX0718 had a balance of $30,412.51 and was held

---

[2]Defendant Federal Deposit Insurance Corporation's Opening Trial Brief ("FDIC's Brief"), Docket No. 49, (Feb. 1, 2010).

[3]Plaintiff's Response Trial Brief ("Pl.'s Reply"), Docket No. 50 (Feb. 22, 2010).

[4]Defendant Federal Deposit Insurance Corporation's Response Trial Brief ("FDIC's Reply"), Docket No. 51 (Feb. 24, 2010).

[5]Opening Brief ("Plaintiff's Supp. Brief"), Docket No. 63 (Sept. 30, 2010); Response Brief ("Plaintiff's Supp. Reply"), Docket No. 65 (Oct. 12, 2010); FDIC's Brief Opposing Plaintiff's Request for Interest, Fees, and Costs ("FDIC's Supp. Brief"), Docket No. 61 (Sept. 28, 2010); Response filed by Defendant ("FDIC's Supp. Reply"), Docket No. 64 (Oct. 12, 2010).  Plaintiff also filed a supplemental response on October 14, 2010 (Supplement to Simultaneous Briefs, Docket No. 66 (Oct. 14, 2010)), which the court struck in part on March 29, 2011 (Order Granting in Part and Denying in Part Defendant's Motion to Strike, Docket No. 71 (Mar. 29, 2011)).

[6]Declaration of Patrick M. Collins Attaching Administrative Record ("Collins Decl."), Docket No. 36 (Aug. 12, 2009), ¶ 3.  All but the last four digits of the account numbers are redacted to protect the personal information of the account holder.  (Collins Decl., ¶ 3 n. 1.  See also  Declaration of Victor Villarreal ("Villarreal Decl."), Docket No. 54 (June 14, 2010), Exh. A.)  Victor Villarreal is a Lead Information Technology Specialist at the FDIC who personally assisted in transferring electronic deposit account records maintained by IndyMac Bank to the FDIC's program for processing deposit insurance, known as the Receivership Liability System ("RLS").  (Id., ¶ 1.)

by Kay and Johnson Nee ITF James and Jennifer Nee.[7]  Account XXXXXX2038 had a balance of $39,715.04 and was held by Kay and Johnson Nee ITF James and Jennifer Nee.[8]  Account XXXXXX4322 had a balance of $2,587.41 and was held by Kay and Johnson Nee ITF James and Jennifer Nee.[9]  Account XXXXXX1302 had a balance of $71,023.96 and was held by Kay Nee ITF James and Jennifer Nee.[10]   Account XXXXXX4544 had a balance of $16,286.37 and was held by Kay Nee ITF James Nee, Jennifer Nee, and Johnson Nee.[11]  Account XXXXXX5641 had a balance of $74,580.01 and was held by Kay Nee ITF James Nee, Jennifer Nee, Johnson Nee, and Lily Wu.[12] Finally, account XXXXXX7974 had a balance of $125,141.86 and was held by Kay and Johnson Nee ITF James Nee and Jennifer Nee.[13]

3.     All seven accounts were informal revocable trust accounts.[14]

**B.     The FDIC's Recovery of IndyMac Data**

4.     Before IndyMac Bank closed, the FDIC requested deposit account records maintained by the computer deposit system at IndyMac Bank.  The FDIC requested approximately 45 data fields for each deposit account along with electronic copies of trial balances, deposit application reconciliations, and the general ledger of the bank.  The FDIC requested this data in advance of IndyMac Bank's closure to test delivery capabilities, prove the balancing and reconciliation processes, and make certain that all required data fields had been

---

[7]Collins Decl., ¶ 3, Exh. A; Villarreal Decl., Exh. A.

[8]*Id.*

[9]*Id.*

[10]*Id.*

[11]*Id.*

[12]*Id.*

[13]*Id.*

[14]Collins Decl., ¶ 3.

1   included.[15]

2   5.   As a result, from March 20 to July 18, 2008, FDIC employees transferred files from the

3       computers of IndyMac Bank to those of the FDIC.  Prior to IndyMac Bank's closure, the

4       FDIC's technical staff worked with he bank to verify the accuracy of the data so that the

5       files provided to the FDIC could be processed properly.  The FDIC verified the sum of the

6       current balance and accrued interest data fields.  It also checked data against the bank's

7       general ledger to ensure that it received all deposit products.[16]

8   6.   Subsequently, the FDIC transferred the computerized deposit account records of IndyMac

9       Bank to its Receivership Liability System ("RLS").  This process involved three types of

10      files maintained at IndyMac Bank:

11      a.   The "Deposit.csv" file, known as the "Deposit File," a database of deposit

12           accounts;

13      b.   The "CIF.csv" file, known as the "Customer Information File," a database of all

14           customers; and

15      c.   The "DIF_CIF.csv" file, known as the "CIF Joint File," which maps customers

16           and their relationships to deposit accounts.[17]

17  7.   Combining information from the Deposit File and the Customer Information File, the

18      FDIC created an account title in the RLS for each IndyMac Bank deposit account.  The

19      Deposit and Customer Information files provided the account number, the owner or owners

20      of each account, the "relationship code" for the names on the account, the then-current

21      deposit balance, the accrued interest, and the date the account was opened, among other

22      information.[18]

23  8.   The "relationship code" is a code included in IndyMac Bank's Customer Information File

24  _____

25  [15]Villarreal Decl., ¶ 3.

26  [16]*Id.*, ¶ 5.

27  [17]*Id.*, ¶ 6.

28  [18]*Id.*

4

that described the relationship between the account owner or owners and other names on the account, including beneficiaries. Names and relationship codes in the Customer Information File were used to create the account title for each account loaded into the RLS. These codes included:

a.      "BNI," which stands for "beneficiary – individual trust," i.e., a beneficiary of a revocable trust account held by a single owner;

b.      "BNJ," which stands for "beneficiary – joint trust," i.e., a beneficiary of a revocable trust account held by multiple owners;

c.      "JBO," which stands for "joint owner with a beneficiary," i.e., a joint revocable trust account;

d.      "JTO," which stands for 'joint owner," i.e., a joint ownership account;

e.      "SLB," which stands for "sole owner with beneficiary," i.e., a beneficiary of a revocable trust account;

f.      "SOL," which stands for "individual owner," i.e., a single ownership account;

g.      "TRS," which stands for "trustee," i.e., funds held by a bank pursuant to an irrevocable trust account; and

h.      "TST," which stands for "trust," i.e., a formal revocable trust account.[19]

9.    The Customer Information File also uses the following acronyms:

a.      "AFT" means "as trustee for";

b.      "ITF" means "in trust for"; and

c.      "POD" means "payable-on-death to."[20]

10.    On July 11, 2008, after the FDIC closed out the day's business so that it could determine end-of-day account balances, it processed IndyMac Bank's deposit data for use in the RLS.[21]  Using all of the data previously described, as uploaded from IndyMac Bank's

---

[19]*Id.*, ¶ 9.

[20]*Id.*, ¶ 10.

[21]*Id.*, ¶ 7.

deposit records, the RLS grouped depositors based on name, address, and tax identification number to produce a "Final Grouping Report." The report lists the accounts owned by an individual depositor, the account balances in those accounts, and the account numbers. If there are uninsured or potentially uninsured funds, the RLS also produces an "XX/PH Worksheet" for use by FDIC Claims Agents.[22] The Final Grouping Report and the XX/PH Worksheet are reviewed by FDIC Claim Agents to approve a deposit insurance determination. Once that determination is finalized, the RLS produces a Notice of Allowance of Claim and a Receivership Certificate for the uninsured balances.[23]

11.   In response to the court's order requiring the FDIC to augment the administrative record to provide source information, the FDIC submitted the information obtained from IndyMac Bank for plaintiff's accounts that was used to populate the RLS. These records show the account numbers, the owners, the relationship code for the names on the accounts, the then-current deposit balance, the accrued interest, and the date the account was opened.[24]

12.   The source information confirms that:

a.      On account XXXXXX0718, Kay and Johnson Nee are listed under the relationship code "JBO," indicating that they are joint owners with a beneficiary. James and Jennifer Nee are listed under relationship code "BNJ," indicating that they are the beneficiaries of a jointly owned revocable trust.[25] The account had a balance of $30,376.15 in principal and $36.36 in accrued interest, confirming the RLS-reported balance of $30,412.51.[26]

---

[22]The abbreviation "XX" refers to "excess" or uninsured balances. The abbreviation "PH" refers to "pass with hold" for potentially uninsured balances that require further review. (*Id.*, ¶ 12.)

[23]*Id.*

[24]*Id.*, ¶ 14, Exh. A.

[25]Villarreal Decl., Exh. A.

[26]*Id.*

b.   On account XXXXXX2038, Kay and Johnson Nee are listed under the relationship code "JBO," indicating that they are joint owners with a beneficiary.   James and Jennifer Nee are listed under relationship code "BNJ," indicating that they are the beneficiaries of a jointly owned revocable trust.[27]   The account had a balance of $39,666.96 in principal and $48.08 in accrued interest, confirming the RLS-reported balance of $39,715.04.[28]

c.   On account XXXXXX4322, Kay and Johnson Nee are listed under the relationship code "JBO," indicating that they are joint owners with a beneficiary.   James and Jennifer Nee are listed under relationship code "BNJ," indicating that they are the beneficiaries of a jointly owned revocable trust.[29]   The account had a balance of $2,587.00 in principal and $0.41 in accrued interest, confirming the RLS-reported balance of $2,587.41.[30]

d.   On account XXXXXX1302, Kay Nee is listed under relationship code "SLB," indicating that she was the sole owner with beneficiaries.   James and Jennifer Nee are listed under relationship code "BNI," indicating they are the beneficiaries of a revocable trust.[31]   The account had a balance of $70,936.90 in principal and $87.06 in accrued interest, confirming the RLS-reported balance of $71,023.96.[32]

e.   On account XXXXXX4544, Kay Nee is listed under relationship code "SLB," indicating that she was the sole owner with beneficiaries.   James Nee, Jennifer Nee, and Johnson Nee are listed under relationship code "BNJ," indicating that they are

---

[27]*Id.*

[28]*Id.*

[29]*Id.*

[30]*Id.*

[31]*Id.*

[32]*Id.*

the beneficiaries of a jointly owned revocable trust.[33]  The account had a balance of $16,266.41 in principal and $19.96 in accrued interest, confirming the RLS-reported balance of $16,286.37.[34]

    f.    On account XXXXXX5641, Kay Nee is listed under relationship code "SLB," indicating that she was the sole owner with beneficiaries.  James Nee, Jennifer Nee, Johnson Nee, and Lily Wu are listed under relationship code "BNI," indicating they are the beneficiaries of this revocable trust.[35]  The account had a balance of $74,491.96 in principal and $88.05 in accrued interest, confirming the RLS-reported balance of $74,580.01.[36]

    g.    On account XXXXXX7974, Kay and Johnson Nee are listed under the relationship code "JBO," indicating that they are joint owners with a beneficiary.  James and Jennifer Nee are listed under relationship code "BNJ," indicating that they are the beneficiaries of a jointly owned revocable trust.[37]  The account had a balance of $124,994.12 in principal and $147.74 in accrued interest, confirming the RLS-reported balance of 125,141.86.[38]

**C.   The FDIC's Insurance Determination**

13.    The FDIC as receiver for IndyMac assigned Patrick Collins to review deposit insurance coverage and claims arising out of IndyMac's failure.  Collins reviewed the seven accounts at issue in this case.[39]

---

[33]*Id.*

[34]*Id.*

[35]*Id.*

[36]*Id.*

[37]*Id.*

[38]*Id.*

[39]Collins Decl., ¶ 2.

14.   Collins concluded that James and Jennifer Nee were qualifying beneficiaries on accounts held by Kay and/or Johnson Nee, because James and Jennifer are Kay's and Johnson's children.  See 12 C.F.R. § 330.10(a) (2008).  Similarly, Johnson Nee is a qualifying beneficiary on an account held by Kay Nee because he is her spouse.  See *id*.  Whether or not Lily Wu was a qualifying beneficiary does not affect the accuracy of the FDIC's deposit insurance determination since, if she was not a qualifying beneficiary, the funds allocated to the trust relationship between Kay Nee as owner and Lily Wu as beneficiary would have been treated as a single ownership account owned by Nee.  See *id*., § 330.10(c).  That amount, along with all other single ownership accounts held by Kay Nee, would have been insured up to $100,000.00.  See *id*., § 330.6(a).  Because Kay Nee did not hold any single ownership accounts at IndyMac Bank, the funds for the relationship between Ms. Nee and Ms. Wu would have been insured whether they were treated as part of a revocable trust account or as a single ownership account.[40]

15.   If an informal revocable trust account has multiple beneficiaries the FDIC will assume that each beneficiary has an equal interest in the account unless otherwise stated in the bank's deposit account records.  If an individual is not qualifying beneficiary, his or her interest is insured as if it were a single ownership account.  Pursuant to 12 C.F.R. § 330.10(a), at the time IndyMac Bank closed, each trust relationship between an owner and a beneficiary was insured up to $100,000.00 across all accounts.  When an account owner named the same qualifying beneficiary on more than one informal revocable trust account at the same bank, the amounts placed in trust for that beneficiary were aggregated for purposes of determining the insured amount.  Collins therefore concluded that the trust relationships for Kay Nee as owner and James Nee as beneficiary totaled $109,049.99, or $9,049.99 over the deposit insurance limit.  He further concluded that the trust relationships for Kay Nee as owner and Jennifer Nee as beneficiary totaled $109,049.99, once again $9,049.99 over the deposit insurance limit.  As a result, Kay Nee had uninsured

---

[40]*Id*., ¶ 4.

9

1    deposits of $18,099.98.[41]   The FDIC therefore sent her a Receivership Certificate for

2    $18,099.98 dated July 22, 2008.[42]

3    16.   Based on the FDIC's calculation that disposition of IndyMac's assets would result in

4         recovery of approximately 50% of the uninsured deposits of IndyMac, the FDIC also sent

5         Kay Nee a 50% advance dividend of $9,049.99.[43]

6    17.   After making this initial determination, the FDIC obtained the Signature Card for Account

7         No. XXXXXX4544 showing that Johnson Nee was an owner on the account and not a

8         beneficiary.  Accordingly, the FDIC determined that Account No. XXXXXX4544 had two

9         owners, Kay Nee and Johnson Nee, and two beneficiaries, James Nee and Jennifer Nee.[44]

10        Based on this additional information, pursuant to 12 C.F.R. § 330.5(a)(1), the FDIC

11        re-determined the deposit insurance applicable to Account No. XXXXXX4544.[45]

12   18.   As a result of that re-determination, the trust relationships for Kay Nee as owner and James

13        Nee as beneficiary totaled $107,692.78, which was $7,692.78 over the deposit insurance

14        limit.   Similarly, the trust relationship for Kay Nee as owner and Jennifer Nee as

15        beneficiary totaled $107,692.78, which was $7,692.78 over the deposit insurance limit.

16        As a result, Kay Nee had $15,385.56 over the deposit insurance limit.  The FDIC sent Ms.

17        Nee a new Receivership Certificate for $15,385.56 dated September 16, 2008.[46]

18   19.   Because the FDIC increased the insured portion of Account No. XXXXXX4544 by

19        $2,714.42, the amount due to Ms. Nee and her husband as an advance dividend decreased

20        to $7,692.78. Kay and Johnson Nee received $1,357.21, which represented the difference

21

22        [41]*Id.*, ¶ 5.

23        [42]*Id.*, Exh. B (Receivership Certificate).

24

25        [43]*Id.* ¶ 6.

26        [44]*Id.* ¶ 7, Exh. C (Signature Card).

27        [45]*Id.* ¶ 7.

28        [46]*Id.* ¶ 7, Exh. D (Revised Receivership Certificate).

1    between the first dividend and the insured amount due them.[47]

2    20.    On July 21, 2010, the Dodd-Frank Act, Pub. L. No.1 I 1-203, took effect. Section 335 of

3          the Dodd-Frank Act amended the Federal Deposit Insurance Act, 12 U.S.C.

4          § 1821(a)(1)(E), by increasing the standard maximum deposit insurance amount

5          ("SMDIA") from $100,000.00 to $250,000.00.  The act made the increase permanent and

6          retroactive to January 1, 2008.  Section 335 directed that, in applying the $250,000.00

7          deposit insurance amount retroactively to January 1, 2008, the FDIC subtract: (1) deposit

8          insurance previously paid to depositors by the FDIC, and (2) payments (such as dividends)

9          previously made to depositors by the FDIC as Receiver.[48]

10   21.    Immediately following the effective date of the Dodd-Frank Act, the FDIC calculated the

11         increased deposit insurance amounts due IndyMac Bank depositors with uninsured deposit

12         balances.[49]  The starting point for its analysis was its final deposit insurance determination

13         following the bank's closure in 2008,[50] specifically each depositor's account balance as of

14         July 11, 2008, the amount of insurance provided to each depositor, the amount of any

15         Receivership Certificates sent to depositors, and the amount of the 50% advance dividend

16         paid to depositors.[51]

17   22.    As a result of the application of the retroactive $250,000.00 insurance coverage under the

18         Dodd-Frank Act, plaintiff's deposits are now fully insured.  On July 22, 2010, the FDIC

19         Receiver sent plaintiff a check for $7,692.78, or 50% of the deposit insurance balance

20         previously deemed uninsured.  No additional funds are owed to plaintiff.

---

[47]*Id.* ¶ 8.

[48]Davis Decl., ¶ 5.

[49]*Id.*, ¶ 6.

[50]*Id.*

[51]*Id.* Ex. C (FDIC's record of payments made to plaintiff, including Receivership Certificates and dividends).

## II. CONCLUSIONS OF LAW

### A.    Standard of Review

23.   The FDIC's determination of insurance coverage is governed by the Federal Deposit Insurance Act ("FDIA"), as amended, 12 U.S.C. §§ 1811 et seq.

24.   The FDIC's final determination "regarding any claim for insurance coverage [is] a final agency action reviewable in accordance with" the Administrative Procedure Act ("APA"). 12 U.S.C. § 1821(f)(4).   Under the APA, the court examines whether the FDIC's decision was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).   The parties agree that the relevant question the court must answer is whether the FDIC's action was arbitrary or capricious.[52]

25.   Final agency action is arbitrary and capricious if the agency "'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"   *O'Keeffe's Inc. v. U.S. Consumer Product Safety Commission*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Manufacturers' Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983)).

26.   A district court is limited to a review of the reasoning on which the agency relied in making its decision. *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1091 (9th Cir. 2007) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).   It can "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicles Manufacturers' Association*, 463 U.S. at 43.   Where an agency offers an "interpretation of its own regulation [that] reflects its considered views," even if those views are developed in response to litigation and communicated in a legal brief, the court should accept the interpretation if convinced it is not "merely a *post hoc* rationalization." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007). See also *Alaska v. Federal*

---

[52]Pls.' Brief at 4; FDIC's Brief at 3.

*Subsistence Board*, 544 F.3d 1089, 1094 (9th Cir. 2008) ("While we may not fabricate a rational basis for an agency's action, we will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned,'" quoting *Motor Vehicles Manufacturers' Association*, 463 U.S. at 43). "'Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Northwest Coalition for Alternatives to Pesticides (NCAP) v. United States Environmental Protection Agency*, 544 F.3d 1043, 1048 (9th Cir. 2008) (quoting *Motor Vehicles Manufacturers' Association*, 463 U.S. at 43).

27.   "[A]n agency's interpretation of its own regulations is 'controlling' unless 'plainly erroneous' or inconsistent with 'the regulations being interpreted.'" *Public Citizen v. Nuclear Regulatory Commission*, 573 F.3d 916, 923 (9th Cir. 2009) (quoting *Long Island Care at Home*, 551 U.S. at 171). See also *Long Island Care at Home*, 551 U.S. at 170-71 ("[A]s long as interpretive changes create no unfair surprise . . . change in interpretation alone presents no separate ground for disregarding the Department's present interpretation"); *River Runners for Wilderness v. Martin*, 574 F.3d 723, 736 (9th Cir. 2009) ("[F]ederal agencies are entitled to some leeway when interpreting their own policies and regulations," citing *Stinson v. United States*, 508 U.S. 36, 45 (1993)). "In other words, we must defer to the [agency's] interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation.'" *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)). See also *Oregon Paralyzed Veterans of America v. Regal Cinemas, Inc.*, 339 F.3d 1126, 1131 (9th Cir. 2003) ("When the meaning of regulatory language is ambiguous, the agency's interpretation of the regulation controls 'so long as it is 'reasonable,' that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations,'" quoting *Martin v. Occupational Safety & Health Review Commission*, 499 U.S. 144, 150-51 (1991)); *Wards Cove Packing Corp. v. National Marine Fisheries*

13

1   *Service*, 307 F.3d 1214, 1218 (9th Cir. 2002) ("An agency's interpretation of regulations

2   it is charged with administering is entitled to a high degree of deference and will be upheld

3   as long as it is not plainly erroneous or inconsistent with the regulation").

4   **B.      Supplementation of the Record**

5   28.   Although judicial review of an agency's decision under 5 U.S.C. § 706 is typically

6   confined to the administrative record, courts have crafted narrow exceptions to this rule.

7   See, e.g., *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) ("In limited

8   circumstances, district courts are permitted to admit extra-record evidence: (1) if admission

9   is necessary to determine 'whether the agency has considered all relevant factors and has

10   explained its decision,' (2) if 'the agency has relied on documents not in the record,'

11   (3) 'when supplementing the record is necessary to explain technical terms or complex

12   subject matter,' or (4) 'when plaintiffs make a showing of agency bad faith.' These limited

13   exceptions operate to identify and plug holes in the administrative record. Though widely

14   accepted, these exceptions are narrowly construed and applied" (citations omitted)).

15   29.   The Ninth Circuit has held that "[t]he 'whole' administrative record [ ] consists of all

16   documents and materials directly *or indirectly* considered by agency decision-makers and

17   includes evidence contrary to the agency's position." *Thompson v. United States*

18   *Department of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (internal quotation marks and

19   citation omitted).

20   30.   When a reviewing court finds it necessary to look outside the administrative record to

21   evaluate whether an agency has considered all relevant factors and adequately explained

22   its decision, it should obtain additional explanations of agency action from the agency

23   itself. *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973) ("If . . . there was such failure to

24   explain administrative action as to frustrate effective judicial review, the remedy was not

25   to hold a *de novo* hearing but, as contemplated by [*Citizens to Preserve*] *Overton Park* [*v.*

26   *Volpe*, 401 U.S. 402 (1971)], to obtain from the agency, either through affidavits or

27   testimony, such additional explanation of the reasons for the agency decision as may prove

28   necessary"); see also, e.g., *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th

14

Cir. 1988) (quoting *Camp*).  In such instances, "[t]he court's inquiry outside the record is limited to determining whether the agency has considered all relevant factors or has explained its course of conduct or grounds of decision."  *Id.* (citing *Friends of the Earth v. Hintz*, 800 F.2d 822, 829 (9th Cir. 1986)).

31.   By contrast, where it appears that the agency has relied on documents not included in the administrative record, "supplementation is appropriate."  *Portland Audubon Society*, 984 F.2d at 1548.  In such instances, "the crux of the analysis is whether the documents or materials [that a party requests be added to the administrative record] were actually considered, directly or indirectly, by the agency decisionmakers."  *Pacific Coast Federation of Fishermen's Association/ Institute for Fisheries Resources v. Gutierrez*, No. 1:06-CV-00245 OWW LJO, 2007 WL 1752287, *2 (E.D. Cal. June 15, 2007) (citing *Thompson*, 885 F.2d at 555).

32.   The FDIC's deposit insurance determinations are governed by regulations set forth in 12 C.F.R. § 330.  These regulations state that "deposit account records" include "account ledgers, signature cards, certificates of deposit, passbooks, corporate resolutions authorizing accounts in the possession of the insured depository institution and other books and records of the insured depository institution, including records maintained by computer, which relate to the insured depository institution's deposit taking function."  12 C.F.R. § 330.1(e).[53]  Regulations providing for the recognition of deposit ownership and fiduciary relationships note that, except under circumstances not relevant here, when "determining the amount of insurance available to each depositor, the FDIC shall presume that deposited funds are actually owned in the manner indicated on the deposit account records of the insured depository institution."  12 C.F.R. § 330.5(a)(1).[54]  Significantly,

---

[53]The term excludes "account statements, deposit slips, items deposited or cancelled checks."  12 C.F.R. § 330.1(e).

[54]The provision further states:
"If the FDIC, in its sole discretion, determines that the deposit account records of the insured depository institution are clear and unambiguous, those records shall be

1   there is no mention of the RLS in the FDIC's governing regulations.

2   33.   The administrative record attached to the Collins declaration did not contain copies of

3   relevant bank records that must be reviewed to evaluate whether the FDIC's determination

4   was arbitrary and capricious or an abuse of discretion.  Indeed, the only record attached

5   was the XX/PH Worksheet produced by the RLS.  Because this document was insufficient

6   to establish ownership of the account, the court could not definitively determine on which

7   records or other information the FDIC relied in making the insurance determination.

8   Indeed, after reviewing the XX/Ph Worksheet produced by the RLS, it appeared clear that

9   the FDIC had relied indirectly on some other document or documents in compiling the

10  information in the RLS.

11  34.   If, after considering the administrative record, the court finds that the agency's rationale

12  is not sufficiently explained, it can "obtain from the agency . . . such additional

13  explanation of the reasons for the agency decision as may prove necessary." *Camp*, 411

14  U.S. at 142-43.  See also *City and County of San Francisco v. United States*, 930 F.Supp.

15  1348, 1355-56 (N.D. Cal. 1996) ("When the administrative record so fails to explain

16  agency action that judicial review of that action is effectively frustrated, the court may

17  'obtain from the agency, either through affidavits or testimony, such additional reasons for

18  the agency decision as may prove necessary.' . . .  Similarly, the court may inquire outside

19  of the administrative record 'when it appears the agency has relied on documents or

20  materials not included in the record,'" quoting *Camp*, 411 U.S. at 143).

21  _____

22  considered binding on the depositor, and the FDIC shall consider no other records
    on the manner in which the funds are owned.  If the deposit account records are

23  ambiguous or unclear on the manner in which the funds are owned, then the FDIC
    may, in its sole discretion, consider evidence other than the deposit account records

24  of the insured depository institution for the purpose of establishing the manner in
    which the funds are owned.  Despite the general requirements of this paragraph

25  (a)(1), if the FDIC has reason to believe that the insured depository institution's

26  deposit account records misrepresent the actual ownership of deposited funds and
    such misrepresentation would increase deposit insurance coverage, the FDIC may

27  consider all available evidence and pay claims for insured deposits on the basis of

28  the actual rather than the misrepresented ownership."  12 C.F.R. § 330.5(a)(1).

35.   In this case, because it appeared that "the agency ha[d] relied on documents not in the record," the court on May 25, 2010 concluded *sua sponte* that supplementation of the record was needed "to determine whether the agency ha[d] considered all relevant factors and explained its decision." Cf. *Home Box Office*, 567 F.2d at 52 (court *sua sponte* ordered the Federal Communications Commission to provide "a list of all of the *ex parte* presentations, together with the details of each, made to it, or any of its members or representatives, during the rulemaking proceedings").

36.   It directed the FDIC to produce: (1) evidence in the form of declarations or documents explaining how the information in the RLS concerning plaintiff's accounts was populated; (2) any documents that would augment the record in that they were documents upon which the FDIC indirectly relied because they constituted the source information for the data input into the RLS; and (3) evidence in the form of declarations or otherwise explaining any technical terms or abbreviations included in the RLS or the documents produced pursuant to this order. The court noted that the supplementation it sought should be comprised of records of the type enumerated in 12 C.F.R. § 330.1(e) upon which the FDIC relied in reaching its final deposit insurance determination, as well as any other information which the FDIC, in its discretion, had gathered and considered concerning plaintiff's accounts prior to the date the insurance determination was made (e.g., communications between the FDIC and plaintiff or between the FDIC and IndyMac employees). Cf. 12 C.F.R. § 330.5(a)(1). In particular, the court sought evidence as to whether the RLS, upon which the FDIC's insurance determination was based, and which itself is not an IndyMac deposit account record, relied on and/or summarized documents not included in the administrative record filed with the court.

37.   In response to the court's order requiring supplementation of the administrative record, the FDIC filed the Villarreal declaration, which (1) explains the methodology by which the RLS database was populated from deposit account records maintained by IndyMac Bank; (2) attaches IndyMac Bank deposit account records reflecting the deposit balance and nature of Nee's accounts at IndyMac Bank; and (3) explains all technical terms and

1   abbreviations used both in the RLS and the IndyMac Bank source information.  It is clear

2   from the Villarreal declaration that this source information is data upon which the FDIC

3   indirectly relied in reaching its insurance determination.

4   **C.     Whether the FDIC Properly Determined Plaintiff's Deposit Insurance**

5   38.   The FDIC's deposit insurance determinations are governed by the regulations set forth in

6       12 C.F.R. Part 330.   As noted, regulations concerning the recognition of deposit

7       ownership and fiduciary relationships state that, except in circumstances not relevant here,

8       when "determining the amount of insurance available to each depositor, the FDIC shall

9       presume that deposited funds are actually owned in the manner indicated on the deposit

10      account records of the insured depository institution."  12 C.F.R. § 330.5(a)(1).  See also

11      *Villafane-Neriz v. F.D.I.C.*, 75 F.3d 727, 731 (1st Cir. 1996) (holding that the FDIC "is

12      entitled to rely exclusively on the account records of the failed institution," and that "while

13      ownership under state law is one prerequisite for insurance coverage, the deposit account

14      records are controlling").  "Deposit account records" include "account ledgers, signature

15      cards, certificates of deposit, passbooks, corporate resolutions authorizing accounts in the

16      possession of the insured depository institution and other books and records of the insured

17      depository institution, including records maintained by computer, which relate to the

18      insured depository institution's deposit taking function."  12 C.F.R. § 330.1(e).   Under

19      this definition, IndyMac Bank's computerized data was a deposit account record on which

20      the FDIC was entitled to rely.

21   39.   At the time IndyMac closed, revocable trust accounts were insured up to $100,000.00 per

22      beneficiary if certain conditions were met.  First, the title of the account had to reflect that

23      the  funds were held pursuant to a formal revocable trust created by an owner or grantor.

24      The owner or grantor was required to retain ownership of the account during his or her

25      life.  12 C.F.R. § 330.10(f)(1), (4) (2008), 69 Fed. Reg. 2829-30 (Jan. 21, 2004) (stating

26      that "revocable trust accounts held in connection with a formal revocable trust created by

27      an owner/grantor and over which the owner/grantor retains ownership during his or her

28      lifetime," qualify for coverage if "the title of the account . . . reflect[s] that the funds in

18

the account are held pursuant to a formal revocable trust"). Second, while the beneficiaries need not be identified by name in the deposit account records, they must be "qualifying" beneficiaries. The "owner's spouse, child/children, grandchild/grandchildren, parent/parents, brother/brothers or sister/sisters" are "qualifying beneficiaries." 12 C.F.R. § 330.10(a) (2008), 64 Fed. Reg. 15657 (Apr. 1, 1999).[55]

40.   While the trust owner is the insured party, insurance coverage is provided for the interest of each qualifying beneficiary up to $100,000.00. 12 C.F.R. § 330.10(a) (2008), 64 Fed. Reg. 15657 (Apr. 1, 1999); 12 C.F.R. § 330.10(f)(1) (2008), 69 Fed. Reg. 2829 (Jan. 21, 2004).

41.   Stated differently, the FDIC insured each grantor up to $100,000.00 for the interest of each qualifying beneficiary. If each grantor held an amount for the benefit of the same qualifying beneficiary, those amounts were separately insured. 12 C.F.R. § 330.10(d) (2008), 63 Fed. Reg. 25760-61 (May 11, 1998); Advisory Opinion FDIC-05-05, Question Regarding Deposit Insurance for a "Spousal Revocable Living Trust," 2005 WL 2979649, *1-2 (Sept. 12, 2005) ("Under this rule, the FDIC would assume . . . that the two grantors . . . have contributed equal amounts. . . . The amount contributed by each grantor for each 'qualifying beneficiary' would be insured separately").

42.   A qualifying joint account is insured separately from an individually owned or single ownership deposit account maintained by the co-owners. A qualifying joint account in the name of both husband and wife at the time IndyMac Bank failed was insured up to $200,000.00 irrespective of any funds deposited in accounts titled in their individual names. 12 C.F.R. § 330.9(a) ("Qualifying joint accounts in the names of both husband and wife which are comprised of community property funds shall be added together and insured up to [$200,000.00], separately from any funds deposited into accounts bearing

---

[55]Under the regulations in effect when IndyMac closed and the FDIC made the initial insurance determination challenged in this action, there was "no requirement . . . that the deposit account[ ] records of the depository institution indicate the names of the beneficiaries of the living trust and their ownership interests in the trust." 12 C.F.R. 330.10(f)(1), (4) (2008) 69 Fed. Reg. 2830 (Jan. 21, 2004).

their individual names"). A joint account qualifies for separate treatment if all co-owners are natural persons, each co-owner has personally signed a deposit account signature card, and each co-owner has equal withdrawal rights. *Id.*, § 330.9(c).[56]

43. If the FDIC finds that the bank records it reviews clearly and unambiguously reflect the ownership of a depositor's accounts, it must rely on those records even if they are erroneous or the product of unauthorized activity. 12 C.F.R. § 330.5(a)(1); *Raine v. Reed*, 14 F.3d 280, 283-84 (5th Cir.1994) (nothing that "[e]ven where the bank itself has committed a mistake," the FDIC may rely on clear records to determine if a deposit is insured); *In re Collins Securities Corp.*, 998 F.2d 551, 555 (8th Cir. 1993) (explaining that the FDIC can rely on bank records, even if they are wrong, because "[d]eposit insurance protects depositors from loss due to the bank's insolvency, not loss from the bank's pre-insolvency mistake"); see also *Villafane-Neriz*, 75 F.3d at 733 (collecting cases).

44. If the deposit records are clear and unambiguous, the alleged absence of a specific document in the records of the failed bank has no probative value; the governing law and regulations allow for consideration only of bank records in existence at the time of the bank's closure. See 12 C.F.R. § 330.5(a)(1) ("If the FDIC, in its sole discretion, determines that the deposit account records of the insured depository institution are clear and unambiguous, those records shall be considered binding on the depositor, and the FDIC shall consider no other records on the manner in which the funds are owned"); see also *Villafane-Neriz*, 75 F.3d at 731-32 (1st Cir. 1996) (stating that the FDIC "is entitled to rely exclusively on the account records of the failed institution"); *Nimon v. Resolution Trust Corp.*, 975 F.2d 240, 246 (5th Cir. 1992) (stating that where "the account records are clear and unambiguous, their statement of the capacity in which funds are owned is conclusive").

45. Nee challenges the FDIC's determination that she is the sole owner of Account No.

---

[56]Although neither party has proffered documentation for account XXXXXX6982 verifying these three requirements, the FDIC found that the account was fully insured. Nee does not challenge this determination.

XXXXXX1302, asserting that a signature card for the account has not been located and produced by the FDIC.[57]   The FDIC conducted a diligent search for the signature card in the records of One West Bank, the successor to IndyMac Federal Bank, F.S.B. and IndyMac Bank, F.S.B., but was unable to find it.   Because the records that did exist were clear and unambiguous, the FDIC was required to rely on them even if they were wrong or incomplete.  See *Raine*, 14 F.3d at 283-84 (noting that "[e]ven where the bank itself has committed a mistake" the FDIC may rely on clear records to determine if a deposit is insured); *In re Collins Securities Corp.*, 998 F.2d at 555.

46.   Consequently, the FDIC's decision that Nee was the sole owner of Account No. XXXXXX1302 was not arbitrary or capricious or otherwise not in accordance with the law.  and was a determination made within the FDIC's sole discretion.  See 12 C.F.R. § 330.5(a)(1).[58]

**D.   Whether Plaintiff Is Entitled To Interest, Fees, and Costs Under the Dodd-Frank Act**

47.   "Section 335 of the [Dodd-Frank Act] retroactively increases the standard maximum deposit insurance amount from $100,000[.00] to $250,000[.00] for depositors in any institution for which, as here, the FDIC was appointed as receiver between January 1,

---

[57]Plaintiff contends that her husband, Johnson Nee, was an additional owner of Account No. XXXXXX1302.

[58]In certain circumstances, a court can consider "extra-record" evidence – i.e., evidence not originally considered by the FDIC – in reviewing the FDIC's insurance determination.  See *Lands Council*, 395 F.3d at 1030 ("In limited circumstances, district courts are permitted to admit extra-record evidence. . . .  Though widely accepted, these exceptions are narrowly construed and applied").  During discovery, the FDIC produced customer information ("CIF") records that confirm its deposit insurance determination and contradict Nee's claim that her husband, Johnson Nee, was an additional owner of Account No. XXXXXX1302.  The CIF records indicate that Account No. XXXXXX9774 was closed and its funds transferred into a new Account No. XXXXXX1302.  (See FDIC Response at 3.)  The new account was opened under the same title and ownership as Account No. XXXXXX9774, which listed Kay Nee as the sole owner (shown as "SLB") and James Nee and Jennifer Nee as sole beneficiaries (shown as "BNI") of an informal revocable trust account.  Johnson Nee was not an owner of prior Account No. XXXXXX9774, and was not added as an owner of new Account No. XXXXXX1302.

2008, and October 3, 2008." *Sunflower Bank, N.A. v. F.D.I.C.*, No. 09-4006-SAC, 2010 WL 3913597, *2 n. 4 (D. Kan. Sept. 30, 2010) (citing Pub.L. No. 111-203).

48. Section 335 of the Dodd-Frank Act requires that "any payment on a deposit claim made by the [FDIC] as receiver. . . to a depositor above the standard maximum deposit insurance amount in effect at the time of the appointment of the [FDIC] as receiver. . . shall be deemed to be part of the net amount due to the depositor under." 12 U.S.C. § 1821(a)(l)(B); Pub. L. No. 111-203, § 335,124 Stat. 1376 (July 21, 2010) (amending 12 U.S.C. § 1821(a)(l)(E)).

49. As a result of application of the retroactive $250,000.00 insurance coverage under the Dodd-Frank Act, Nee's deposits are fully insured.  On July 22, 2010, the FDIC Receiver sent Nee a check for $7,692.78, or 50% of the deposit insurance balance previously deemed uninsured.

50. Nee contends that in addition to this payment, she is entitled to interest, fees, and costs related to the retroactive deposit insurance she received as a result of the Dodd-Frank Act. Congress has not expressly waived the FDIC's immunity against prejudgment interest claims.  See, e.g., *Battista v. FDIC*, 195 F.3d 1113, 1120 (9th Cir. 1999) ("Congress has not expressly waived the FDIC's immunity against prejudgment interest, nor does the FDIC fall under the exception of the government's waiver immunity when it operates as a commercial entity"); *Sharpe v. FDIC*, 126 F 3d 1147, 1154 n. 3 (9th Cir. 1997) (stating that the FDIC's sovereign immunity bars an award of prejudgment interest); *Far West Federal Bankv. OTS-Director*, 119 F.3d 1358, 1366-67 (9th Cir. 1997) (same); see also *Spawn v. Western Bank-Westheimer*, 989 F.2d 830, 838 (5th Cir. 1993) ("[W]e hold that the FDIC is immune from prejudgment interest awards in the context of erroneous deposit insurance determinations").

51. Where the FDIC acts as a deposit insurer - as it has here - it retains its sovereign immunity as a regulator and an agency of the United States, *Spawn*, 989 F.2d at 838,which also bars an award of attorneys' fees or other litigation costs against the FDIC.  See *Anderson v. United States*, 127 F.3d 1190, 1191 (9th Cir. 1997) ("[S]overeign immunity bars an award

of attorneys' fees against the United States unless a statute expressly authorizes such an award"); *Campbell v. United States*, 835 F. 2d 193, 195 (9th Cir. 1987) ("Except to the extent it has waived its immunity, the federal government is immune from claims for attorneys' fees"); *Van Hoomissen v. Xerox Corp.*, 503 F.2d 1131, 1132 (9th Cir. 1974) ("[T]he government is exempt from liability for costs and attorneys' fees except as specifically and unequivocally authorized by Congress"); see also *Cunningham v. FBI*, 664 F.2d 383, 384 (3d Cir. 1981) ("In the absence of any express waiver of sovereign immunity, costs and expenses of litigation are not recoverable from the United States").

52.   The Dodd-Frank Act neither waives the FDIC's sovereign immunity nor provides for the payment of interest, fees, or costs on retroactively insured deposit amounts.  Consequently, Nee is not entitled to an award of interest, fees, or costs related to the retroactive deposit insurance she received.

## III. CONCLUSION

For the reasons stated, the court finds that plaintiff is not entitled to recover further insurance for her revocable trust accounts from the FDIC, nor is she entitled to recover interest, attorneys' fees, or costs.

DATED: May 31, 2012

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE